## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 14 & 02 C 1152 | **DATE** | 9/8/2004 |
| **CASE TITLE** | Advance Iron Works, Inc. vs. John Edwards Construction Company, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. Judgment is entered in favor of plaintiff Advance Iron Works, Inc. and against defendant John Edwards Construction Company in the amount of $13,322.75. This constitutes a disposition of the complaint and counterclaim. The parties are given five days from the date of this opinion to submit brief statements as to the disposition of this case with respect to the two remaining defendants.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | 2 |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | SEP 0 9 2004 |
| | Notified counsel by telephone. | date docketed |
| | Docketing to mail notices. | GMA docketing deputy initials |
| | Mail AO 450 form. | 9/8/2004 |
| | Copy to judge/magistrate judge. | date mailed notice |

**Document Number**

**23**

courtroom deputy's initials IS

U.S. DISTRICT COURT

2004 SEP -8 PM 3: 37

Date/time received in central Clerk's Office

IS

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

**SEP 0 9 2004**

|  |  |
|---|---|
| **ADVANCE IRON WORKS, INC.,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| **JOHN EDWARDS CONSTRUCTION** | ) |
| **COMPANY, EVEREST REINSURANCE** | ) |
| **COMPANY, and MID-STATE SURETY** | ) |
| **CORPORATION,** | ) |
| | ) |
| Defendants. | ) |

Case Nos. 02 C 0014 &
02 C 1152

Magistrate Judge
Martin C. Ashman

## MEMORANDUM OPINION AND ORDER

This case was brought as an action under the Miller Act, 40 U.S.C. §270a *et seq.*, and for

breach of contract by Plaintiff Advance Iron Works, Inc. ("Advance") against Defendant John

Edwards Construction Company ("JECC"), as the general contractor, and Everest Reinsurance

Company and Mid-State Surety Corporation, as co-sureties on the Miller Act bond. JECC filed a

counterclaim alleging breach of contract and quantum meruit. The parties have consented to

have this Court conduct any and all proceedings in this case, including the entry of final

judgment. *See* 28 U.S.C. § 636(c); Local R. 73.1(a).

After conducting a bench trial, the Court has carefully considered the testimony of the

witnesses who appeared at trial, the exhibits introduced into evidence, the written submissions of

the parties and the arguments of counsel. The following are the Court's findings of fact and

conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). To the extent certain

findings of fact may be deemed to be conclusions of law, they shall also be considered the

Court's conclusions of law. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered the Court's factual findings.

## I. Findings of Fact

### A. Claims of the Parties

1. JECC and Advance entered into an agreement whereby Advance was to furnish and install certain structural steel for a project known as the VA Hines Reactivation Center Renovation (the "Project"). Advance claims that it furnished and erected certain of the structural steel elements but was unable to erect and deliver all of the steel due to delays in the Project. JECC improperly terminated Advance's subcontract even though Advance was ready, willing, and able to complete the work on the Project.

2. JECC claims that Advance breached the subcontract by failing to properly complete the subcontract work on a timely basis. It also claims that Advance breached its subcontract with Up-Rite Steel Company, which has since settled with JECC and assigned its claims to JECC (consolidated case 02 C 1152).

### B. The Parties

3. Advance is an Illinois corporation, with its principal place of doing business in East Hazel Crest, Cook County, Illinois. Advance is in the business of manufacturing and providing structural and miscellaneous steel and related services, including the erection of said steel. Robert Sutphen, the Vice President of Advance, testified at trial on behalf of Advance.

4.     JECC is an Illinois corporation with its offices in Downers Grove, Illinois. JECC is in the business of acting as a general contractor. John Pilut testified at trial. Since 1980 he has been President and sole owner of JECC. Del Calhoun, a project manager and general superintendent for JECC, also testified at trial. His duties include scheduling, on-site field adjustments and, in this case, running the Project in the field. Vincent Allegra, an estimator and project manager for Up-Rite Steel Erectors, also testified at trial. The final witness was Marc Bennett Karlin. During the pertinent time, Karlin's duties at JECC included handling invoices from vendors within the company and distributing funds to the vendors.

5.     Defendant Everest Reinsurance Company is a New Jersey corporation, authorized to do business in the State of Illinois. It is in the business of issuing surety bonds.

6.     Defendant Mid-State Corporation is a Michigan corporation, authorized to do business in the State of Illinois. It is in the business of issuing surety bonds.


C.     **The Pertinent Contracts**

7.     In July of 1999, JECC was awarded a contract by the Department of Veterans Affairs in response to its bid of $2,855,500.00 to renovate the Reactivation Center located at the Edward Hines Jr. VA Hospital in Hines, Illinois (the "General Contract"). The schedule called for the Project to be completed in November, 2000. (JTX 5.)[1]

8.     Prior to the award of the General Contract, Advance submitted a proposal to JECC to provide steel fabrication and erection for the Project. (JTX 1.)

---

[1] The trial exhibits are referred to by the following abbreviations: JTX refers to the joint exhibits; DX refers to Defendant's exhibits, and PX refers to Plaintiff's exhibits.

9.     On November 23, 1999, JECC and Advance entered into a subcontract for the steel work for the sum of $220,000 (the "Advance Subcontract"). (JTX 3.)

10.     On March 16, 1999, Advance and Up-Rite Steel entered into a subcontract in the amount of $50,000 for the erection of the steel for the Project (the "Up-Rite Subcontract"). (DX 74.)

### D.     Relevant Provisions of the Subcontract

#### 1.     Scheduling

11.     The dates of commencement and substantial completion were not set forth in the Advance Subcontract; rather, the parties agreed that the dates would be set according to the schedule from JECC. (JTX 3 at §§ 9.1-9.3 & Ex. B.)

12.     The parties agreed that time was of the essence in the completion of the Advance Subcontract. (JTX 3 at § 9.4 and Ex. B.)

13.     One mobilization was included for the Advance work.  Additional mobilizations would require additional compensation from JECC. (JTX 3 at Ex. H.)  Advance agreed to "cooperate with [JECC] in scheduling and performing their Work to avoid conflict or interference with the work of others." (JTX 3 at Ex. B.)

#### 2.     Dispute resolution

14.     AIA Document A201, the General Conditions of the Contract for Construction (the "General Conditions"), was incorporated by reference into the Advance Subcontract. (JTX 3 at § 1.2.)  Paragraph 4.3 of the General Conditions governs the procedure for claims and disputes that might arise between JECC and Advance with respect to the Project. (JTX 4.)  A "claim" is a

"demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract." It also includes "other disputes and matters in question between [JECC and Advance] arising out of or relating to the Contract."

15.    Claims must be initiated by written notice within 21 days after occurrence of the event giving rise to the claim or within 21 days after the claimant first recognizes the condition giving rise to the claim, whichever is later. (JTX 4 at §§ 4.3.1 & 4.3.2.)

16.    Pending final resolution of the claim, Advance was to proceed diligently with performance of the Advance Subcontract, unless it had not been paid, and JECC was to continue to make payments in accordance with the terms of the subcontract. (JTX 4 at § 4.3.3.)

17.    Under the terms of the Advance Subcontract, Advance was required to promptly make all claims for additional cost, extension of time and damages to JECC. (JTX 3 at § 5.3.)

18.    Pursuant to section 6.1.1 of the Advance Subcontract, any claim arising out of the subcontract was to be subject to mediation as a condition precedent to the filing of a lawsuit. Mediation was also required (with limited exceptions) under the General Conditions. (JTX 4 at § 4.5.1.)

19.    The Court finds that there were no damages from the failure to mediate any of the claims at issue.

20.    The Advance Subcontract also contained an arbitration provision. (JTX 3 at § 6.2.) The provision did not call for binding arbitration and the contract was not breached by a failure to arbitrate.

3.    Working conditions

21.    As incorporated by § 14.2, the working conditions found at Exhibit H to the
Advance Subcontract (JTX 3) include the following provisions:

- [JECC] shall provide suitable, level compacted steel
  lay down area and access for cranes, equipment, trucks
  to point of pick

- All work shall conform to the Code of Standard Practice
  For Buildings and Bridges, by AISC, latest edition

- Erection work shall be based upon OSHA standards
  for steel erectors

4.    Progress payments

22.    The Advance Subcontract sets forth provisions for progress payments. As long as
Advance submitted timely applications for payment while allocating the entire amount due
among the portions of the work, JECC agreed to include such amounts on its applications for
payment to the Owner and to pay Advance after it received payment. (Ex. 3 at §§ 11.3, 11.5 &
15.2.) Each pay application was to cover a period of one calendar month ending on the last day
of the month. (Ex. 3 at § 11.2.) A failure to comply with the requirements meant that the
subcontract would not be paid. (Ex. 3 at Ex. H.)

23.    If JECC disapproved part or all of the application for payment, it was required to
provide written notice to Advance. As soon as the basis for the disapproval was remedied, JECC
would pay Advance. (JTX 3 at § 11.8.)

24.     Advance was allowed to stop its work on the basis of JECC's non-payment, but only if it had provided proper notice before any work was stopped. Advance's sum due could be increased by the amount of reasonable costs of demobilization, delay and remobilization. (JTX 3 at § 4.7.1.)

## E.     Work at the Project

25.     The Project involved closing in a square courtyard (Courtyard A), closing in two triangular courtyards (Courtyard B), and creating a front canopy. Advance fabricated the steel for the Project and began delivering it in April of 2000. (JTX 11.) Up-Rite installed the steel for Courtyard A between April 19 and April 25, 2000. (DX 75.)

26.     Courtyard B was unavailable for steel erection until Saturday, April 29, 2000. After April 29, 2000, Courtyard B was available for steel erection. JECC notified Advance that it was to continue the erection work at that time.

27.     However, Upright performed no work on the Project from April 26 through June 5, 2000. On June 26 and 27, 2000, Up-Rite erected the steel for Courtyard B, only three days after the area experienced .11 inches of rain on June 23rd and .94 inches of rain on June 24th. (DX 90.)

28.     Between April 29th and May 7, 2000, the only rain in the area was .32 inches on May 1. While the eight remaining days were clear, and it was obviously possible to erect the steel after a minimal amount of rain as that was eventually what transpired, Up-Rite did not take advantage of those days to erect the steel. However, four of those days fell on weekends. Overall, the Court finds credible Allegra's testimony that Up-Rite was unable to complete the

work until the end of June because it experienced scheduling conflicts with either the weather or the crane rental. (DX 31, 90.)

29.     The evidence shows that had there been a proper road at the Project, the work could have been done sooner because the crane could be stationed on a stable base even shortly after a rainy day. JECC failed to provide a proper road as required under the terms of the Advance Subcontract and OSHA regulations.

## F.     Pay applications and RCOs

30.     On March 20, 2000, Advance submitted its first pay application for work anticipated through the end of March, but neglected to deduct ten percent for retentions. JECC promptly paid the amount less the retentions without requiring Advance to submit a new pay application. (JTX 13.)

31.     Pay Application Number 2 was submitted on April 25, 2000, for work through the end of April. Advance stated that scheduled value of the erection work to be done by Up-Rite was $45,000, although the contract amount was for $50,000. It asked for $35,000 (70%) for Up-Rite's work, and for 93% of the contract price for material and labor, although the erection work by Up-Rite had not been 70% completed, and the detailing work had not been completed for Courtyard A. The Veterans Administration rejected JECC's request for the payment to Advance, and the amount was reduced accordingly. Karlin informed Advance that there had been an adjustment to its billing and Advance did not object. Although JECC did not require Advance to submit a new pay application, it nevertheless paid Advance a reduced amount

($126,000) for 70% of the material and fabrication charge and 50% of the steel erection, less retentions. (JTX 14.)

32. On June 1, 2000, Advance submitted Pay Application Number 3 for work performed in May. The application requested the remainder of the funds for the material and fabrication but did not request any funds for steel erection. The VA rejected the amount as originally submitted, but when JECC resubmitted the application, without requiring Advance to fill out a new pay application, the amount was approved. On September 5th, Advance was paid the amount that it had requested.

33. The evidence shows that through the course of its dealings, JECC would provide progress payments to Advance without Advance submitting a new pay application even if it did not agree with the amount that Advance requested or if the form was filled out improperly. (JTX 13, 14.)

34. Between June 26 and July 25 the steel in Courtyard B was erected and detailed. Advance submitted Pay Application Number 4 on August 1, 2000, for work performed in July. Advance requested payment of $20,000 for steel erection, certifying that the work was 100% complete. However, not all of the bracing had been installed with respect to Courtyard A, a link-beam had not been installed with respect to Courtyard B, and, most importantly, the canopy steel had not been erected or detailed. Because Advance faxed the pay application to JECC on August 1, the Court finds that it knew that the work billed for would not be completed by the end of July. However, there is also evidence that JECC would accept a pay application for work that would be completed by the 15th of the next month. (DX 32.) This work, however, would not be completed by August 15.

- 9 -

35.    Advance issued three Requests for Change Order ("RCO"). RCO #1 (to lengthen beams), submitted at the end of June, was approved in the amount of $1,405 in October of 2000. RCO #2 (to rework anchor bolts and setting plates), submitted at the beginning of July, was approved in the amount of $2,064, also in October of 2000. (JTX 12.) For RCO #3, Advance requested $5,676 for trucking, storage, and increased ironworker rates since June 1, caused by the access road and foundation delays, in a letter dated August 18, 2000. (DX 30.) RCO #3 was not approved. (DX 31.) JECC continued to request additional information and documentation relating to RCO-3 between September 28 and November 2. (DX 32 (Sept. 28), 38 (Oct. 25), 41 (Nov. 2).)

36.    Under paragraph 4.3.2 of the General Conditions a party to the subcontract must submit a request for change such as RCO #3 within 21 days of first recognizing the condition giving rise to the claim.

37.    Advance submitted Pay Application Number 5 on November 20, 2000 for RCO's #1, 2, and 3. (JTX 17.) In a response letter the next day, JECC informed Advance that the fifth pay application had been rejected because the work had not been completely finished, RCO #3 had not been approved, and because Advance had already been terminated as of November 1, 2000. (DX 42.)

38.    JECC has never paid Advance for any of the change orders.

**G.    Termination of the Advance Subcontract**

39.    Advance could not erect the canopy steel until the foundations had been poured. The concrete foundations were the responsibility of others on the Project, not Advance. The foundations could not be poured until the other steel work was completed.

- 10 -

40.     On September 28, 2000, JECC informed Advance that it must install the bracing (fifty angles) in Courtyard A and the link-beam in Courtyard B so that the drywall and mason contractors could complete their work. The letter also advised Advance that the canopy would be ready for erection on October 9, 2000, and that the work on Courtyards A and B should be completed by that time. (DX 32.)

41.     By October 11, 2000, Advance had taken no action to complete the bracing on Courtyard A, to install the link-beam on Courtyard B, or to install or erect the canopy steel. Therefore, JECC sent Advance a seven day notice for Advance to return to the Project and to continue its work to completion or face termination. (DX 33.) This notice was sent pursuant to § 7.2.1 of the Advance Subcontract. (JTX 3.)

42.     Advance responded to the seven-day notice on October 13, 2000. It stated that it would not deliver or erect any steel on the Project unless JECC approved the $5,676 requested in RCO #3 and pay it $10,000 for Up-Rite. (DX 34.)

43.     By October 24, 2000, Advance had not proceeded with the work and JECC sent a second and final seven-day notice. (DX 36.)

44.     Advance responded on October 25, 2000. It stated that under § 4.7 of the Advance Subcontract it was entitled to stop work for non-payment. Advance again demanded that RCO #3 be approved and that it be paid $10,000 before it shipped the remaining steel or completed the work. It reiterated that Up-Rite was refusing to return to work until it was paid. (DX 37.)

45.     Pursuant to § 4.7 of the Advance Subcontract, Advance is allowed to stop work for nonpayment. However, it must provide seven days advance notice of its intent to stop work.

- 11 -

(JTX 3.) Advance did not provide seven days notice. Additionally, Advance suspended its work because a change order was in dispute.

46.     On the same day, JECC wrote back. It reminded Advance that the last invoice received had been returned for correction and that JECC was still waiting for a revised invoice. It also noted several discrepancies with the trucking and storage costs. The letter further requested supporting back-up for the charges and a current bill or invoice. (DX 38.)

47.     On November 1, 2000, JECC sent a Notice of Termination to Advance, pursuant to § 7.2.1 of the Advance Subcontract. (DX 39.)

48.     The next day Advance replied. It stated that it was willing to complete the work, but only if were paid over $6,000 for increases to RCO #3. (DX 40.) JECC declined to approve the changes. (DX 41.)

49.     Pay Application Number 5 was submitted on November 20, and rejected by JECC on November 21. (DX 42.) Advance did not respond to JECC's rejection letter.


**H.     Corrective Work in Courtyard A**

50.     JECC claims that the steel in Courtyard A was not fabricated or erected properly, and it paid over $10,000 for Pro-Excel Contractors to repair the work by framing crooked overhangs. However, JECC failed to notify either Advance or Up-Rite of this defective steel erection, despite the fact that Up-Rite was on site at the time the defect was discovered, even though the Advance Subcontract requires such notification. (JTX 3 at Ex. H.)

51. The Court finds credible Advance's assertion that the cause of the problem was the discrepancy between the structural and architectural drawings. (PX 1.) Advance is not liable for the resulting damages.


## I. Plans to Finish the Work are Stymied by Missing Steel

52. On approximately November 21, 2000, JECC made arrangements for another steel erector to complete the bracing on Courtyard A. The union decided that JECC would not be allowed to use another steel erector, and Up-Rite did the bracing work. The work was done directly through JECC.

53. On December 12, 2000, JECC filed suit against Advance in the Circuit Court of Cook County to obtain the canopy steel, which had been paid for, from Advance. (DX 44.) JECC, Advance, and Up-Rite entered into a settlement agreement terminating the lawsuit the next day whereby Advance would immediately deliver all of the remaining canopy steel. Up-Rite would erect the steel. (DX 45, 47.) Under the agreement JECC reserved all of its rights and defenses pursuant to the Advance Subcontract. JECC agreed to pay $5,000 to Up-Rite which would be credited to the Advance Subcontract. (DX 45.) An escrow agreement was also created and JECC tendered $2,700 to Advance's counsel, to hold in escrow, along with a Rescission of Termination. (DX 48.)

54. After Advance delivered the steel and Up-Rite began the steel erection, it was discovered that some of the necessary steel tubing was missing. Up-Rite could not complete the detailing due to the missing pieces.

55.     Advance had fabricated the missing canopy tube steel in March of 2000. (PX 5.)

One copy of Advance's Shipping Ticket Number 2 bears a hand notation that the tubing was

added to a partially empty delivery truck which was scheduled to deliver steel for Courtyard A on

April 28, 2000 to the Project site. Advance submitted evidence that the final shipped weight of

the truck was higher than the anticipated weight of the total typed material on the shipping ticket,

which it interprets to mean that the handwritten additions referring to the missing canopy steel

accounted for the difference in shipping weights. However, the missing steel only weighed just

over 300 pounds, which would not account for a two thousand pound discrepancy. There is no

evidence how much the other steel that was purportedly added to the shipment weighed. An

internal Shipping Piece Status Report maintained by Advance and dated May 3, 2000,

inventories the missing pieces and indicates that they had not been shipped. (JTX 11.) Up-Rite

had no recollection of the connecting pieces for the canopy steel being delivered to the Project in

April, 2000. No witnesses testified that they actually saw the missing pieces being delivered to

the Project site. The Court finds credible the testimony that it is not a common practice for a

steel supplier to include small pieces relating to another later phase of the work with a shipment

that is specific to a prior phase of the work. Therefore, the Court finds that the missing canopy

steel pieces were not delivered in April of 2000 or subsequently. Because Advance did not

deliver all of the canopy steel to the site as required by the settlement agreement, we find that it

was in material breach of the agreement.

56.     On January 8, 2001, Advance requested a change order in the amount of

$1,339.54 for the fabrication and delivery of steel to replace the missing canopy tubing. (DX

52.) JECC refused to approve RCO #4 and responded with a demand that the escrow payment be

returned. However, it indicated that it would reconsider its determination that Advance was in default if it delivered the remaining canopy steel and made arrangements for the completion of its erection. (DX 53 and 54.) Advance continued to maintain that it had already delivered the steel and insisted that it be paid additional money to remanufacture and deliver it. (DX 55.) The escrow funds remained in escrow pending a court determination of rights.

57.     JECC purchased the missing pieces of canopy steel from another steel supplier for $550.00. By February 21, 2001, Up-Rite had finished the work needed for the canopy and had installed the link-beam in Courtyard B.

58.     On March 5, 2001, JECC sent Advance notice that it had incurred additional expenses in completing the subcontract and that Advance owed JECC $14,137.90.

## II.     Conclusions of Law

### A.     Jurisdiction

1.     Jurisdiction is proper pursuant to 28 U.S.C. § 1331 because this matter was brought as an action under the Miller Act, 40 U.S.C. §270a *et seq.*

### B.     Illinois Law Applies

2.     The parties have not disputed that Illinois law applies.

### C.     JECC Materially Breached the Advance Subcontract First

3.     While parties are bound to the terms of a contract, and a failure to perform any term thereof is a breach of contract, a breaching party will only be held responsible for damages resulting from a material breach. *In re Krueger*, 192 F.3d 733, 742 (7th Cir. 1999). "A material breach occurs where the covenant not performed is of such importance that the contract would

- 15 -

not have been made without it." *Dragon Constr. v. Parkway Bank & Trust*, 678 N.E.2d 55, 58 (Ill. App. Ct. 1997).

4.    JECC materially breached the Advance Subcontract by its failure to provide adequate access to the Project site. This breach delayed the progress of the Project.

5.    A party to a contract may waive provisions which are beneficial to it. *In re Krueger*, 192 F.3d at 738. Waiver may be explicit or by conduct which indicates that strict compliance with the term at issue will not be required. *Id.*

6.    JECC materially breached the Advance Subcontract by its failure to make timely payments to Advance. JECC had made previous payments to Advance even when the pay application did not reflect the correct amount due to Advance and therefore waived strict compliance with the payment terms of the subcontract. JECC could have adjusted improper charges when it submitted the subsequent requests for reimbursement to the VA so that Advance would receive partial payment for work performed.

7.    Once a contract has been materially breached, the non-breaching party is discharged from its duty to perform. *Dragon Constr.*, 678 N.E.2d at 58. It may cease further work under the contract, declare the contract at an end, and recover the value of the work already performed. *B&C Elec., Inc. v. Pullman Bank & Trust Co.*, 421 N.E.2d 206, 211 (Ill. App. Ct. 1981). Because JECC had breached the contract, Advance was entitled to stop work under the subcontract and recover the value of the work it had already performed.

8.    "Where a party has materially breached a contract, he cannot take advantage of terms of the contract which benefit him nor recover damages from the other party to the contract." *Robinhorne Constr. Corp. v. Snyder*, 251 N.E.2d 641, 645-46 (Ill. App. Ct. 1969).

- 16 -

Because JECC materially breached the Advance Subcontract first, it is not entitled to costs to complete the Advance Subcontract work.

9. Therefore, Advance is entitled to foreseeable damages from JECC's breach of the Advance Subcontract. RCO #3 will be awarded, but only in the amounts requested for storage and trucking plus the usual markup, not for claims properly asserted on Up-Rite's behalf.

**D. Advance Materially Breached the Settlement Agreement.**

10. The failure of Advance to supply all of the canopy steel to the Project was a material breach of the December 2000 settlement agreement. *See Dragon*, 678 N.E.2d at 58 (a contractual provision is material is the contract would not have been made without it). Once Advance materially breached the settlement agreement, JECC was discharged from its duty to perform the remainder of the settlement agreement. *See id.* After the settlement agreement was properly terminated, JECC was justified in obtaining the missing canopy steel from another fabricator and in hiring another erector to finish the work that needed to be completed.

11. Because Advance materially breached the settlement agreement, it cannot recover damages from JECC. *See Robinhorne Constr.*, 251 N.E.2d at 646-47 (party who materially breaches a contractual provision cannot take advantage of the terms of the contract which benefit it). Instead, JECC is entitled to foreseeable damages from Advance's breach of the settlement agreement which include its costs to complete the steel work on the Project.

12. Additionally, JECC asserts valid claims formerly owned by Up-Rite against Advance. Therefore, Advance additionally owes damages to JECC as assignee of Up-Rite's claims.

- 17 -

**E.     Damage Summary**

13.     Advance is awarded damages in the following amounts from JECC on the

complaint:

- base contract work plus RCO #1, 2,      $ 42,948.75
  and 3 as requested by Advance
  (less wages and equipment and markup
  for same in the amount of $1,764)

- storage at Advance's site until steel      980.00      =      43,928.75
  delivered in December

14.     The amount owed to Advance by JECC will be reduced by the following damages

owed by Advance to JECC and by Advance to Up-Rite on the counter-claim:

- return of the escrow payment      2,700.00

- labor for clearing snow from roof      550.00
  on January 12, 2001

- cost to have missing canopy steel      550.00
  tubing fabricated

- labor for clearing snow from roof      800.00
  on January 25 and 26

- remaining balance pursuant to the      24,536.00
  Up-Rite Subcontract

- wage escalation      720.00

- equipment rental      750.00      =      <u>30,606.00</u>
                                                    =      **$13,322.75**

15.     Therefore, the net due to Advance on the complaint less the amount owed on the

counterclaim is $13,322.75.

### III.  Conclusion

For the reasons set forth in this opinion, judgment is entered in favor of Advance Iron Works in the amount of $13,322.75.  This constitutes a disposition of the complaint and counterclaim.

The parties are given five days from the date of this opinion to submit brief statements as to the disposition of this case with respect to the two remaining defendants.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
United States Magistrate Judge

Dated:  September 8, 2004.

Copies have been mailed to:

EVDOXIA BEROUKAS, Esq.
1472 West Balmoral Avenue
Chicago, IL 60640


Attorney for Plaintiff

LAWRENCE R. MOELMANN, Esq.
Hinshaw & Culbertson, L.L.P.
222 North LaSalle Street
Suite 300
Chicago, IL 60601-1081

Attorney for Defendants